IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL LEE BOYLES,

          Petitioner,

    v.

TROY BOWSER,

          Respondent.

Case No. 2:17-cv-01839-MO

OPINION AND ORDER

    Matthew A. Schindler
    Attorney at Law
    1500 SW 11th Ave.
    Ste. Unit 2101
    Portland, OR 97201

        Attorney for Petitioner

    Ellen F. Rosenblum, Attorney General
    Samuel A. Kubernick, Assistant Attorney General
    Department of Justice
    1162 Court Street NE
    Salem, Oregon 97310

        Attorneys for Respondent

1 – OPINION AND ORDER

MOSMAN, District Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of his Multnomah County convictions dated October 31, 2005. For the reasons that follow, the Petition for Writ of Habeas Corpus (#2) is denied.

<u>**BACKGROUND**</u>

Petitioner worked as a juvenile probation officer with the Oregon Youth Authority. He was accused of taking advantage of his position to sexually molest minor males whom he supervised, prompting the Multnomah County Grand Jury to charge him with a large number of crimes in a multi-count Indictment.[1] Respondent's Exhibit 102.

The trial court removed Petitioner's first two appointed attorneys due to actual conflicts stemming from their past representation of victims from this case. Petitioner's Exhibit 22, p. 5. On March 9, 2004, it appointed a third attorney, Gayle Kvernland, to represent Petitioner. The following month, Petitioner wrote a letter to the Presiding Judge of the Multnomah County Circuit Court to complain about a lack of communication with Kvernland. Petitioner's Exhibit 10. Petitioner would ultimately file a complaint with the Oregon State Bar against her and move the trial court to provide him with substitute counsel.[2] Petitioner's Exhibit 22, p. 4.

---

[1] The Indictment originally charged Petitioner and three co-defendants with 101 crimes. Respondent's Exhibit 102. The State dismissed a variety of charges both prior to and during the trial, including all charges as to two of Petitioner's co-defendants.

[2] The Oregon State Bar concluded that Petitioner's allegations against Ms. Kvernland "were not supported by any credible evidence." Petitioner's Exhibit 22, p. 32.

On August 3, 2004, the Honorable Julie E. Frantz held a 45-minute hearing on the motion for substitute counsel where she explored Petitioner's issues with Ms. Kvernland in detail. Kvernland explained that during her first meeting with Petitioner, he "expressed concern that [she] was a sole practitioner and [she] wouldn't be able to give him enough attention." Petitioner's Exhibit 22, p. 5. She advised Judge Frantz that she was still receiving voluminous discovery associated with the case and had already devoted a great deal of time and resources to the matter:

> I was fortunate enough to apply to Salem for money for a trial assistant and they gave me 150 hours. I have a gal who's already spent seven hours with Mr. Boyles, as well as reviewed the file and is cataloging all of the file documents, and also reviewing all of his legal research and reporting back to me in very lengthy, detailed emails. I think he's being very well taken care of. He does not agree with that.
>
> I also have an investigator that has fifty hours of work that he's been authorized to do that he is continuing to work on until I tell him otherwise. So I'm not sure – I don't think there's a basis to have me removed as counsel, but I think Mr. Boyles disagrees with that.

*Id* at 5-6.

While Ms. Kvernland indicated that she could still zealously represent Petitioner, she expressed her concern that Petitioner might not cooperate with her which would put her in an ethical quandary. *Id* at 33. Judge Frantz denied Petitioner's motion to substitute counsel and instructed Petitioner to

continue to work with Kvernland. *Id* at 37; Petitioner's Exhibit 23.

Two days later, Petitioner filed another complaint against Ms. Kvernland with the Oregon State Bar as well as another motion asking the trial court to appoint substitute counsel. Petitioner's Exhibits 24 & 25. Ms. Kvernland filed her own motion for substitution of counsel, prompting the trial court to hold another hearing on August 16, 2004. Ms. Kvernland represented that she had received four more bar complaints to which she must respond and felt that she could no longer continue to represent Petitioner in a zealous manner. Petitioner's Exhibit 27. She also described that when her trial assistant traveled to meet with Petitioner, "within the first fifteen seconds he became physically aggressive towards her to the point she had to summon the guards to let her out." *Id* at 4.

Judge Frantz permitted Ms. Kvernland to withdraw and agreed to replace her with substitute counsel, but specifically admonished Petitioner that she was not inclined to provide him with any additional attorneys:

> But, Mr. Boyles I want to make it absolutely clear the Court will appoint another attorney to represent you, but unless there's an actual conflict that's not created by you, then you will not receive [another attorney.]
>
> That will give you the opportunity to work with a different attorney, but if there are personality conflicts, then you may find yourself in a position of representing yourself which, of course, would . . . from the Court's point of view would not be

> advisable. So, I just want to make sure you
> understand that you're not eligible [for] a
> long list of substituted attorneys. You're
> entitled to an attorney, and I'm giving you
> the chance to work with a second attorney.
> All right.

Petitioner's Exhibit 27, p. 7.

Petitioner became argumentative, and the trial judge urged him "to make every effort to with that [new] attorney" because "you will not receive another attorney if it is a working relationship problem." *Id* at 9. Petitioner responded, "With all due respect, Your Honor, perhaps I should have another judge." *Id*. Judge Frantz indicated it was too late for a new judge, and that she was simply "trying to give you fair warning that it's important for you to try to work with an attorney." *Id* at 9-10.

On August 19, 2004, the trial court appointed Clayton Lance to represent Petitioner. Petitioner wrote a letter to Lance on October 10, 2004 advising him that they were overdue to meet about his case. Petitioner's Exhibit 33. Lance and Petitioner appeared to exchange phone calls and letters during the rest of the calendar year but did not meet in person. Petitioner's Exhibits 34 & 35. On November 26, 2004, Petitioner wrote to Lance, "It is my sincere hope that we can someday stop our "pen-pal" type of attorney-client relationship and that you will find the time to set up regular meetings with me." Petitioner's Exhibit 37, p. 1 (underlining in original). He also included a list of 13 questions he expected counsel should be prepared to answer during an in-person meeting, and informed Lance that "it would appear that only minimal progress has been made on my

case" and asked if this was true or if Lance and his investigator "simply forgot to keep me updated[.]" *Id* at 4.

On January 6, 2005, Petitioner wrote a letter to the trial court indicating that he was not satisfied with Lance. Petitioner's Exhibit 41. The same day, he wrote a letter to Lance complaining about a lack of communication and asking for copies of various discovery. Petitioner's Exhibit 42. On January 25, 2005, Judge Frantz referred the letter to Lance with the directive to immediately address the issues raised and offered to hold a hearing if necessary. Petitioner's Exhibits 43 & 44.

On February 8, 2005, Judge Frantz received another letter from Petitioner claiming that Lance had not made contact with him as she had directed. Petitioner's Exhibit 45. Two weeks later, Petitioner proceeded to file a bar complaint against Lance.[3] Petitioner's Exhibit 47. He also sent a letter to Judge Frantz advising her of his concerns about a potential conflict of interest with counsel. Petitioner's Exhibit 48. Judge Frantz reviewed the correspondence and determined that there was no such ethical conflict. Petitioner's Exhibit 53.

On or about March 2, 2005, Petitioner's case was reassigned to the Honorable Michael H. Marcus for all purposes. On March 3, 2005, Judge Marcus held a hearing to explore the issues Petitioner was having with Lance. When the Judge offered the use of his chambers so Petitioner could have a private conversation with Lance, Petitioner responded that "the attorney-client

---

[3] The Oregon State Bar concluded that the matter warranted investigation. Petitioner's Exhibit 51. It does not appear, however, that Lance was ever disciplined for conduct occurring in Petitioner's case.

relationship is pretty well dissolved." Trial Transcript, p. 12. The judge nevertheless encouraged Petitioner to meet with Lance privately. After that meeting, Petitioner expressed his concern about what he claimed to be a lack of communication with Lance, as well as his fear that he could end up with no witnesses or evidence to present. *Id* at 20.

Counsel responded that he had been busy indexing the very voluminous discovery in the case which was a "gigantic process" because it involved over 15,000 pages. *Id* at 26. Lance also represented that he "quit taking cases so that at the end of th[ese] last four months, the beginning of this year I could focus on Mr. Boyles." *Id* at 27. He also indicated that where Petitioner was unhappy with the investigator assigned to the case, Lance was prepared to replace the investigator with an investigator known to, and requested by, Petitioner. *Id*. Moreover, Lance indicated that Petitioner wanted another attorney assigned to the case in addition to Lance in a co-counsel role, and that he was willing to do so if the judge authorized it. *Id* at 28.

Lance readily admitted that his communication with Petitioner had been subpar, and he committed to improvement in his communication with Petitioner and that his phone system would be re-configured to receive collect calls from the Jail. *Id* at 37. The trial court concluded that all of this was "very helpful frankly, so I don't see any basis, at this point, to conclude that this isn't going to work as well as it can." *Id* at

38. The judge declined to substitute counsel and, instead, set a status conference for the following week. *Id* at 41.

On April 26, 2005, Judge Marcus held a hearing and inquired into the attorney-client relationship. Petitioner indicated that although he had been concerned previously, Lance had contacted him, met with his family members, filed motions Petitioner felt were "on target and very appropriate," and that he no longer had any complaints about Lance. *Id* at 53-54.

Petitioner's satisfaction with Lance was fleeting. In early May he once again moved for new counsel prompting Judge Marcus to hold another hearing on May 16, 2005. He stated that although Lance had made a commitment to sit down with him at least twice a week in person, that had not happened. *Id* at 110. He also claimed that Lance was not allowing him to have input into pretrial motions and that the phone line in Lance's office was still not accepting collect calls. Lance responded that although he had not personally met with Petitioner, he had spoken to him about the legal issues, taken notes on Petitioner's thoughts about the motions, and that it was very difficult for him to see Petitioner for face-to-face meetings at the Inverness Jail due to time-consuming procedural issues unique to that facility. *Id* at 111-12. However, Lance indicated that if the Court wished to remove him, he would be pleased to withdraw where he perceived Petitioner to be a particularly demanding client. *Id* at 113, 116.

Because Judge Marcus had not presided over Ms. Kvernland's earlier withdrawal, the prosecutor provided context for Petitioner's complaints about Lance:

> There was an opportunity for Mr. Boyles to have one more attorney appointed to him and that was Clayton Lance. And it was in no uncertain terms that if they can't get along at that point, per Judge Frantz, that he would be going alone.
>
> Now, I don't know if – if this is where we're at right now, but I will say for the record, some of the very same complaints that we hear about here with regard to Mr. Lance's representation are the same that we heard with regards to Ms. Kvernland's representation, that he wasn't happy with how often they would meet and they would talk and whether or not in his mind he felt the strategy – whether it was even legally an option for Ms. Kvernland or Mr. Lance to follow, that it – it should be filed or explained or somehow remarked upon.
>
> So I just offer that for your – your history.

*Id* at 119. The prosecutor also noted that, given this history, the State would object to any additional request for substitution of counsel. *Id* at 120.

The prosecutor did, however, offer to go through each motion to give Petitioner an opportunity to have input and "feel completely and wholly involved with every motion and every step and he can weigh in on those right now." *Id*. The Judge did not immediately proceed in this direction and, instead, allowed Petitioner and Lance an opportunity to meet privately in the

courtroom to discuss strategy on the motions.[4] He warned Petitioner, however, "I'm not likely going to give you another lawyer just because you make life difficult for him or he makes life difficult for you." *Id* at 125.

Petitioner and Lance had a productive meeting. Petitioner was "very appreciative" of counsel's motions and no longer wished to go through them individually. *Id* at 127. Lance committed to speaking with Petitioner at 8:00 that night and set forth Petitioner's desired evidentiary objections the following afternoon at 1:30. He had taken notes on Petitioner's thoughts and indicated his willingness to type those up that very afternoon. *Id*. The Judge also agreed to sign an order to have Petitioner transferred to the Multnomah County Detention Center so he would be more easily accessible for personal visits by counsel. *Id* at 132. All issues having apparently been resolved for the time being, Judge Marcus agreed to resume the hearing in the morning.

The continuation of the hearing did not take place the next morning, but occurred on May 26, 2015. Lance notified the court that he and Petitioner had some disagreement as to some prefiling motions. The court permitted Petitioner to file his own motions on those points so he could raise his arguments and adequately preserve his record. *Id* at 218-23. At no time during the May 26 hearing did Petitioner indicate that he desired

---

[4] Although Petitioner was of the opinion that counsel was not doing enough on his case and that additional motions needed to be filed, Judge Marcus noted that in his 15 years on the bench, he had "never seen a stack of motions this comprehensive before in a criminal case." Trial Transcript, p. 123.

substitute counsel or that he did not wish for Lance to continue representing him. By June 2005, co-counsel Jeff Johnson was in place to assist in Petitioner' defense and began appearing for the defense. *Id* at 265.

Petitioner proceeded to trial with Lance and Johnson acting as co-counsel. At the conclusion of trial, the jury found Petitioner guilty of two counts of Sodomy in the First Degree, Nine counts of Sexual Abuse in the Second Degree, fourteen counts of Sexual Abuse in the Third Degree, five counts of Delivering Marijuana to a Minor, twelve counts of Official Misconduct, and one count of Tampering with a Witness. Respondent's Exhibit 103, p. 8. As a result, the trial court imposed a prison sentence totaling 894 months and declared Petitioner ineligible for participation in any early release programs. Respondent's Exhibit 101.

Petitioner took a direct appeal where, with the assistance of newly appointed appellate counsel, he argued that the trial court erred when it failed to allow his request for substitute counsel. Respondent's Exhibit 103. Not content with appellate counsel's filing, Petitioner also filed his own *pro se* supplemental memoranda. Respondent's Exhibits 104 & 105. The Oregon Court of Appeals affirmed the trial court's decision without issuing a written opinion, and the Oregon Supreme Court denied review. *State v. Boyles,* 222 Or. App. 213, 193 P.3d 629 (2008), *rev. denied,* 346 Or. 116, 205 P.3d 888 (2009).

Petitioner next filed for post-conviction relief ("PCR") in Multnomah County where the PCR court granted relief on a single

claim of ineffective assistance of counsel when it determined that counsel should have taken exception to the trial court's failure to deliver a jury concurrence instruction with respect to one of the Sexual Abuse in the Third Degree charges.[5] Respondent's Exhibit 414. The PCR court otherwise denied relief on Petitioner's remaining claims.

Petitioner and Respondent cross-appealed the PCR court's decision, with Petitioner once again submitting his own *pro se* briefing in addition to his counseled brief.[6] The Oregon Court of Appeals issued a written opinion wherein it reversed the PCR court's decision to grant relief on the jury concurrence instruction issue, and otherwise affirmed without discussion the PCR court's denial of Petitioner's remaining claims. *Boyles v. Myrick,* 282 Or. App. 517, 385 P.3d 1227 (2017). The Oregon Supreme Court denied Petitioner's subsequent Petition for Review. 361 Or. 645, 398 P.3d 39 (2017).

On November 16, 2017, Petitioner filed this 28 U.S.C. § 2254 habeas corpus case raising 25 grounds for relief.[7]

---

[5] Count 46 of the Indictment charged Petitioner with Sexual Abuse in the Third Degree and Count 42 charged him with Sexual Abuse in the Second Degree. Both charges were based upon very similar allegations. The PCR court concluded that without a specific concurrence instruction, it was not possible to determine whether the two convictions were based upon the same conduct. The PCR court therefore merged Counts 42 and 46.

[6] The Oregon Court of Appeals struck Petitioner's *pro se* briefing, apparently because it was not incompliance with Oregon's Rules of Appellate Procedure. Respondent's Exhibit 418.

[7] Petitioner purported to file an Amended Petition (#53) on August 25, 2019, but counsel mistitled that document as it was actually intended to constitute a supporting memorandum. As discussed in the Court's Order (#56), the supporting memorandum (#53) was not properly filed and was ultimately superseded by Petitioner's Amended Memorandum (#60) (which is mistitled as a "Supplemental Memorandum") filed November 15, 2019. Where Petitioner never amended his Petition, the original Petition (#2) remains the operative pleading in this case.

Respondent asks the Court to deny relief on the Petition because: (1) Petitioner has not met his burden of proof with respect to the claims he does not support with briefing; (2) any argued claims that are not contained within the Petition are not eligible for review; (3) Petitioner failed to fairly present Oregon's state courts with his Ground Five claim alleging prosecutorial misconduct, leaving it procedurally defaulted; and (4) Petitioner's Ground One claim of trial court error pertaining to the trial court's failure to allow him substitute counsel for Lance, while preserved for federal habeas review, does not entitle him to relief where the trial court's decision was not objectively unreasonable.

## DISCUSSION

## I.   Unargued and Unpled Claims

As noted above, Petitioner presents 25 grounds for relief in his Petition. In his lengthy supporting memorandum which totals 236 pages, he chooses to provide argument in support of two claims: (1) the trial court abused its discretion in denying his motion for substitute counsel without conducting an adequate hearing thereby depriving him of his Sixth Amendment right to counsel (Ground One); and (2) the prosecutor engaged in misconduct by failing to disclose the State's efforts to have criminal charges against witness Billy Simms dismissed to facilitate his testimony (Ground Five).[8] Where Petitioner does

_____

[8]   Counsel fails to describe which grounds for relief he is actually arguing in his overlength memorandum. Counsel states that his supporting memorandum is also intended to reaffirm unidentified *pro se* arguments, and he asks the Court to grant relief on "all grounds stated." The Court appointed counsel to help clarify the issues in this case and present a cohesive argument, not

not argue the merits of his remaining claims, he has not carried his burden of proof with respect to these unargued claims. *See Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (Petitioner bears the burden of proving his claims). Accordingly, Grounds Two through Four, and Six through Twenty-Five are dismissed.

The Court also recognizes that Petitioner's supporting memorandum can be construed to contain argument to support a variety of claims that are not raised within the Petition. These claims, improperly raised in Petitioner's Amended Memorandum (#60), are not properly before the court for its consideration. *See* Rule 2(c), Rules Governing Section 2254 Proceedings, 28 U.S.C. foll. § 2254 (requiring each habeas petition to "specify all the grounds for relief which are available to the petitioner"); *Greene v. Henry*, 302 F.3d 1067, 1070 fn 3 (9th Cir. 2002) (a court need not consider claims not raised in the petition); *see also* Order (#6) (requiring counsel to ensure all claims he intended to argue were contained with the *pro se* Petition).

///

///

---

advise it to review the record for additional *pro se* legal arguments. Indeed, in its Order (#6) appointing counsel, it specifically advised that counsel should ensure that the *pro se* Petition clearly stated all grounds for relief that counsel would argue in the case. Where counsel has not provided clarity on these issues, it has been difficult to decipher how the claims argued in the supporting memorandum correspond to the claims raised in the Petition. After careful review, the Court concludes that Petitioner, with the assistance of appointed counsel, has chosen to support Grounds One and Five with briefing.

Finally, after being permitted to exceed the 35-page briefing limit by more than 200 pages, counsel's attempt to incorporate by reference other arguments throughout the voluminous record into his overlength brief is not acceptable and such arguments are not before the Court for its consideration.

## II. __Exhaustion and Procedural Default__

As Ground Five, Petitioner asserts that he was the victim of prosecutorial misconduct when the State failed to disclose that it had intervened to assist witness Billy Simms in his own criminal matters to ensure Simms would be available to testify against Petitioner. He claims that the State never advised the defense of its recommendation to dismiss the charges against Simms or that it had facilitated Simms' expedited release from custody. Respondent contends that Petitioner failed to adequately preserve this claim for habeas corpus review.

A habeas petitioner must exhaust his claims by fairly presenting them to the state's highest court, either through a direct appeal or collateral proceedings, before a federal court will consider the merits of those claims. *Rose v. Lundy*, 455 U.S. 509, 519 (1982). "As a general rule, a petitioner satisfies the exhaustion requirement by fairly presenting the federal claim to the appropriate state courts . . . in the manner required by the state courts, thereby 'affording the state courts a meaningful opportunity to consider allegations of legal error.'" *Casey v. Moore,* 386 F.3d 896, 915-916 (9th Cir. 2004) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, (1986)).

If a habeas litigant failed to present his claims to the state courts in a procedural context in which the merits of the claims were actually considered, the claims have not been fairly presented to the state courts and are therefore not eligible for federal habeas corpus review. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Castille v. Peoples*, 489 U.S. 346, 351 (1989).

In this respect, a petitioner is deemed to have "procedurally defaulted" his claim if he failed to comply with a state procedural rule, or failed to raise the claim at the state level at all. *Carpenter*, 529 U.S. 446, 451 (2000); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). If a petitioner has procedurally defaulted a claim in state court, a federal court will not review the claim unless the petitioner shows "cause and prejudice" for the failure to present the constitutional issue to the state court, or makes a colorable showing of actual innocence. *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Sawyer v. Whitley*, 505 U.S. 333, 337 (1992); *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

In this case, Petitioner's appointed PCR appellate attorney did not raise any claims of prosecutorial misconduct. Instead, the Amended Appellant's Brief focused solely on claims of ineffective assistance of counsel. Respondent's Exhibit 416. Although Petitioner attempted to file a *Pro Se* Supplemental Appellant's Brief which contained a claim of prosecutorial misconduct related to the circumstances of Simms' testimony, the Oregon Court of Appeals specifically struck that brief and, therefore, did not consider the merits of any of the claims within it. Respondent's Exhibit 417, pp. 36-41; Respondent's Exhibit 418. Where Petitioner proffered his Ground Five claim of prosecutorial misconduct to Oregon's appellate courts in a procedural context in which the merits were not considered, he failed to fairly present it. Because the time for doing so

passed long ago, the claim is procedurally defaulted and Petitioner has not excused his default.

## III. **The Merits**

### A.  **Standard of Review**

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct, and Petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413. The "unreasonable

application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410. Twenty-eight U.S.C. § 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

**B.    <u>Analysis</u>**

As Ground One, Petitioner alleges that the trial court abused its discretion when it denied his request for substitution of counsel without conducting an adequate hearing into the issues underlying his attorney-client relationship with Lance. He contends that it was incumbent upon the trial court to provide him with another attorney once it became obvious that Lance had not been diligent in either his communications with Petitioner or in performing substantive investigation in the case. He believes that Lance's shortcomings contributed to a complete breakdown of the attorney-client relationship that constructively denied him his Sixth Amendment right to counsel.

The Supreme Court has determined that a state court must provide competent counsel to an indigent defendant in a trial for any serious crime. *Gideon v. Wainwright*, 372 U.S. 335 (1963). The right to counsel does not, however, carry with it a guarantee of a "meaningful relationship." *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983). The Supreme Court has also expressly noted that impecunious defendants such as Petitioner do not enjoy a right to choose their own counsel under the Sixth Amendment.

*Caplin & Drysdale v. United States*, 491 U.S. 617, 624 (1989). Moreover, matters of trial strategy are the province of counsel, not criminal defendants, such that disagreement over such issues does not establish an irreconcilable conflict warranting substitution of counsel. *Murray v. Shriro*, 882 F.3d 778, 816-17 (9th Cir. 2018).

The Court has already recounted at length the interactions between counsel, Petitioner, and the trial court on the issue of substitution of counsel. While Petitioner's first two attorneys did have actual conflicts of interest, Petitioner's disapproval of Lance echoed the reasons he found Gayle Kvernland unacceptable. Petitioner had legitimate concerns regarding Lance's communications with him, and the trial court gave Petitioner multiple opportunities to thoroughly describe his issues with counsel. During these hearings, Lance admitted to Judge Marcus that he had not communicated effectively with Petitioner and pledged to do better. Trial Transcript, p. 37.

The trial court, already having permitted Kvernland to withdraw, worked at length with Petitioner and Lance to accommodate Petitioner's requests and ensure his concerns were addressed. In the wake of his May 16, 2005 hearing on his request for substitute counsel, it appeared that counsel and Petitioner had worked out how to approach the case in a way that worked for both of them, with Lance and the trial court making many accommodations for Petitioner. Petitioner appeared satisfied with the arrangement and did not give the trial court any further indication that he could not work with Lance. Based

upon these developments and Petitioner's responses to the trial court's efforts to resolve his concerns, Judge Marcus reasonably believed that substitution of counsel was not necessary.

While Lance could have communicated better with Petitioner from the outset of his appointment, the issue before this Court is whether, on this record, the Multnomah County Circuit Court's decision not to substitute counsel for Lance violated Petitioner's Sixth Amendment right to counsel. The record shows that there was no irreconcilable conflict in the attorney-client relationship, and that the trial court made every effort to accommodate Petitioner's concerns. Petitioner ultimately proved to be a difficult client with very specific ideas about how extensively he should be involved in the discovery process, how an attorney should approach the case, and which motions counsel should present. Petitioner recognized he had particular needs not generally shared by some defendants when he informed Judge Marcus "that Mr. Lance would be a terrific attorney for someone who's not able to assist and aid in their own defense, but for someone who wants to take an active role and have some input into the process, it's just not – it's just not working."[9] Trial Transcript, pp. 110-11. However, even after telling Judge Marcus that the arrangement was not working, Petitioner, Lance, and the trial court reached accommodations with which Petitioner felt comfortable. *Id* at 53-54, 127-32.

---

[9] Petitioner represented in a letter to the trial court (or to counsel, who shared it with the court) that he had spent 468 hours in the Multnomah County Jail's law library studying case cites, statutes, and evidentiary rules. Trial Transcript, p. 219.

One of the accommodations the trial court made was to appoint Jeff Johnson to act as co-counsel with Lance. *Id* at 240. Petitioner never complained about Johnson. In this respect, even assuming Petitioner had an irreconcilable conflict with Lance (which he did not), he still enjoyed representation by an attorney with whom he was not in conflict so as to satisfy the Sixth Amendment. Based upon the totality of the record, the state-court decision denying relief on Ground One was neither contrary to, nor an unreasonable application of, clearly established federal law.

## IV.    <u>Evidentiary Hearing</u>

Finally, in his Amended Memorandum (#60), Petitioner asks the Court to expand the record through discovery and an evidentiary hearing in order to further develop claims he did not adequately develop during his state-court PCR proceedings. He claims that he failed to sufficiently develop the record in state court because his PCR attorney did not effectively do so with respect to claims of prosecutorial misconduct. Such errors by PCR counsel are attributable to Petitioner. *Williams v. Taylor*, 529 U.S. 420, 432 (2000); *see also Martinez v. Ryan*, 566, U.S. 1 (2012) (excusing procedural default as to PCR counsel performance only arising out of failure to raise substantial ineffective assistance of trial counsel claims). Where Petitioner failed to develop his record, and where he has not met the stringent standards associated with 28 U.S.C. § 2254(e)(2), he is not entitled to additional evidentiary development in this case.

**CONCLUSION**

For the reasons identified above, the Petition for Writ of Habeas Corpus (#2) is denied. The Court declines to issue a Certificate of Appealability on the basis that Petitioner has not made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

March 29, 2022
_____
        DATE

*Michael W. Mosman*
_____
Michael W. Mosman
United States District Judge